ORCAFUNDING

**OrcaFunding LLC**
**Sale of Future Receipts Agreement**

This Sale of Future Receipts Agreement ("Agreement") effective, April 17, 2026, is made by and between OrcaFunding LLC ("Buyer", "we", or "us"), each Seller identified below ("Seller" or "you"), and each person who signs this Agreement as a Guarantor (each a "Guarantor").

**Seller Information:**

| | |
|---|---|
| **Merchant Legal Name: Pine Forest Campco LLC & 11200 West Florissant Avenue Realty LLC & the entities listed on Exhibit A** | **DBA Name:** |
| **Entity Type: LLC** | **FEIN: 88-2442248** |
| **State of Organization: PA & MO & CT** | **Phone: 917-453-1192** |
| **Address: 50 Quality St # 110357, Trumbull, CT 06611** | **Bank Name: Bank of America & the Banks listed on Exhibit A** |
| **Account Number(s): [redacted] & the accounts listed on Exhibit A** | **Routing Number: [redacted]** |

**Owner/Guarantor Information:**

| | | |
|---|---|---|
| **Name of Owner Guarantor 1: Michael A Shabsels** | **Ownership %: 50%** | **Email: [redacted]** |
| **Home Address: [redacted]** | **City/State: New York, NY** | **Zip Code: 10022** |
| **Name of Owner Guarantor 2: David Arthur Shabsels** | **Ownership %: 50%** | **Email: [redacted]** |
| **Home Address: [redacted]** | **City/State: Scarsdale, NY** | **Zip Code: 10583** |

**Purchase Information**

The transaction contemplated by this Agreement is a purchase of Future Receipts. "Future Receipts" means all payments received by Seller, or its right to receive such payments, in the ordinary course of Seller's business, including but not limited to (a) payments made by cash, check, Automated Clearing House ("ACH") or other electronic transfer; (b) payments, or rights to payments, made by credit card, debit card, bank card, charge card (each such card shall be referred to herein as a "Payment Card"); (c) accounts and payment intangibles; and (d) payments made by any other form. You will deliver the entire Purchased Amount of Future Receipts to us over time by allowing us to debit the Periodic Amount (which is subject to adjustment) on each Remittance Day. We will debit the Periodic Amount from one or more deposit accounts authorized by you for this purpose (each, an "Authorized Account").

| | |
|---|---|
| **Purchased Amount of Future Receipts**<br>$1,400,000.00 | **How we calculated the Periodic Amount**<br>The Periodic Amount is the Specified Percentage of the average sales revenue we estimate you will receive. Our estimate is based on a review of your past revenue. We used information you provided to us to make this estimate. Beginning on the first Remittance Day, the Periodic Amount will be the amount identified on this page. You have the right to adjust the Periodic Amount to better reflect actual revenue as it changes over time. Please refer to Section 4 (Reconciliation Process) to learn how you can adjust the Periodic Amount. |
| **Purchase Price**<br>$1,000,000.00 | |
| **Periodic Amount** ***(debit amount)***<br>$43,750.00 | **Remittance Days will occur:**<br>Weekly<br>("Daily" debits are conducted Monday-Friday, "Weekly" debits are conducted once a week)<br>*We will notify you of the day or days on which each Remittance Day will occur. |
| **Specified Percentage**<br>1.46% | |

**Amounts Deducted from Purchase Price:**

| | |
|---|---|
| Prior balance paid to Buyer | $(0.00) |
| Prior balance paid to third parties | $(0.00) |
| Origination fee | $(20,000.00) |
| Total Amount Deducted From Purchase Price | $(20,000.00) |
| **Net Funded Amount**<br>This is the Purchase Price minus the Total Amount Deducted from Purchase Price. This is the amount of funds to be deposited into your Authorized Account. Please note this amount may change if any portion of the Purchase Price is being applied to a prior balance. This is because the amount required to satisfy a prior balance may change between the date we prepared this Agreement and the date we deposit the funds. | $980,000.00 |

1. **Sale of Future Receipts.** Seller hereby sells and assigns to Buyer, without recourse, the Purchased Amount of Future Receipts described above. As payment for the Purchased Amount, Buyer agrees to pay Seller the Purchase Price shown above and Seller will receive funds equal to the Net Funded Amount.

2. **Buyer's Acceptance of Agreement.** The obligation of Buyer under this Agreement will not be effective unless and until Buyer has completed its review of the Seller and has accepted this Agreement by delivering the Net Funded Amount, shown above, into any Authorized Account. Prior to accepting this Agreement, Buyer may conduct a processing trial to confirm its access to any Authorized Account and the ability to withdraw the initial Periodic Amount. If the processing trial is not completed to the satisfaction of Buyer, Buyer will refund to Seller all funds that were obtained by Buyer during the processing trial.

3. **Delivery of Purchased Amount.** If Remittance Days are to occur on a frequency other than daily, then Buyer will notify Seller on or before the date Buyer has accepted this Agreement, of the day of the week or month (as applicable) on which Remittance Days will occur. The Purchased Amount will be delivered to Buyer each Remittance Day in a series of remittances each equal to the Periodic Amount. Seller authorizes Buyer to debit an Authorized Account on each Remittance Day, by initiating an ACH debit entry or by creating a remotely created check or electronically created item, in the amount of the initial Periodic Amount or, following any adjustment pursuant to Section 4 (Reconciliation Process), the adjusted Periodic Amount. For this purpose, Seller shall provide Buyer with all required account information and will provide an appropriate ACH authorization to Buyer. Seller agrees not to change any account information without prior written consent from Buyer. If a Remittance Day occurs on a bank holiday, Seller authorizes Buyer to initiate a debit entry on the next day on which Seller's bank is open in an amount equal to the Periodic Amount and, if Remittance Days are scheduled to occur every Week Day, Buyer may initiate the debit entry in an amount equal to the Periodic Amount scheduled for the next day, plus the Periodic Amount that would have been debited on the preceding bank holiday. If any ACH entry, check, or electronically created item is returned for insufficient funds or otherwise rejected, then Seller will pay Buyer a $35 fee for each such returned or rejected check or item. In addition, Seller will reimburse Buyer for any charges incurred by Buyer resulting from the returned or rejected ACH entry, check, or electronically created item. Buyer is not responsible for any overdrafts or rejected transactions that may result from Buyer's debiting any amount authorized under the terms of this Agreement.

4. **Reconciliation (IMPORTANT PROTECTION FOR SELLER).** The Periodic Amount is based on an estimate of the Specified Percentage of Seller's Future Receipts. At any time, Seller or Buyer have the right to require a new review of Seller's revenue for the purpose of evaluating whether the Periodic Amount continues to accurately reflect the Specified Percentage of Seller's actual revenue for the period reviewed (a "Reconciliation").

    a. **How Seller may Request a Reconciliation**. Seller may request a Reconciliation by calling Buyer at 646-452-3664 or sending an email to Docs@orca-funding.com.

    b. **How Buyer may Request a Reconciliation.** Buyer may request a Reconciliation in writing via regular mail or e-mail.

    c. **Reconciliation Review.** After receiving or making a request for Reconciliation pursuant to this Agreement, Buyer shall calculate Seller's average revenue for the 30-day period preceding the Reconciliation request (the "Review Period"). Seller shall cooperate with any Reconciliation by providing bank statements or other records of Seller's actual revenue received during the Review Period ("Reconciliation Information"). Reconciliation Information may be provided electronically. Seller shall also provide Buyer with any assistance or other information needed to access or view any Reconciliation Information. Upon receipt of the Reconciliation Information, Buyer shall promptly (but no later than 3 calendar days following such receipt) calculate whether the total of all Periodic Amounts remitted to Buyer during the Review Period was greater than the Specified Percentage of Seller's actual revenue during the Review Period (an "Excess") or less than the Specified Percentage of Seller's actual revenue during the Review Period (a "Shortfall").

    d. **Adjusting the Periodic Amount.** If there was an Excess, then Buyer shall decrease the Periodic Amount for each subsequent Remittance Day. If there was a Shortfall, then Buyer may (but is not required to) increase the Periodic Amount for each subsequent Remittance Day. In the case of any such adjustment, Buyer shall adjust the Periodic Amount to an amount equal to the Specified Percentage of Seller's reasonably anticipated average revenue, based on the Reconciliation Information. After an adjustment, the Periodic Amount shall remain unchanged until a subsequent adjustment occurs in accordance with this Section.

    e. **Failure to Provide Reconciliation Information.** If Seller requests a Reconciliation and fails to provide the Reconciliation Information within 10 calendar days after Seller's Reconciliation request, Buyer may consider Seller's Reconciliation request withdrawn. If Buyer requests a Reconciliation and Seller fails to provide the Reconciliation Information within 10 calendar days after Buyer's Reconciliation request, Buyer may adjust the Periodic Amount based on the best information reasonably available to Buyer.

5. **Changing the Remittance Day.** The parties may change the frequency of the Remittance Day pursuant to this Section. The effective date of any change to the Remittance Day is referred to herein as the "Change Effective Date". Any change to the Remittance Day will be accompanied by a change to the Periodic Amount immediately following the Change Effective Date. The process for requesting changes to the Remittance Day and calculation of the Periodic Amount is described below.

    a. **Changing Remittance Day to occur each Week Day.** Either Buyer or Seller may request that a weekly or monthly Remittance Day be changed to occur on each Week Day. The party requesting a change must notify the other party in accordance with Section 23 (Notices). The Change Effective Date shall take effect promptly, but no later than one week from the date such notice is either sent or received by Buyer. Immediately after the Change Effective Date, the new Periodic Amount shall be adjusted to an amount equal to: the Periodic Amount immediately prior to the Change Effective Date, divided by five (in the case of a change from a weekly Remittance Day) or twenty (in the case of a change from a monthly Remittance Day).

    b. **Changing Remittance Day to occur weekly or monthly.** When the Remittance Day is scheduled to occur each Week Day, the Remittance Day may be changed to occur weekly or monthly, but only if both parties agree to such change in writing (which may be memorialized in an electronic record, including email). To be effective, both parties must agree on the day each Remittance Day will occur. Immediately after the Change Effective Date, the new Periodic Amount shall be adjusted to an amount equal to the Periodic Amount immediately prior to the Change Effective Date, multiplied by five (in the case of a change to a weekly Remittance Day) or twenty (in the case of a change to a monthly Remittance Day).

c. **Effect on Reconciliation.** Following any Change Effective Date, subsequent adjustments to the Periodic Amount pursuant to Section 4 (Reconciliation Process) shall account for the change in the frequency of the Remittance Day as described above.

**6. Nonrecourse Sale of Future Receipts (THIS IS NOT A LOAN).** Seller is selling a portion of a future revenue stream to Buyer at a discount, not borrowing money from Buyer. There is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by Buyer. Seller acknowledges that it has no right to repurchase the Purchased Amount from Buyer. Buyer assumes the risk that Future Receipts may be remitted more slowly than Buyer may have anticipated or projected because Seller's business has slowed down, and the risk that the full Purchased Amount may never be remitted because Seller's business goes bankrupt or Seller otherwise ceased operations in the ordinary course of business. Buyer is buying the Purchased Amount knowing the risks that Seller's business may slow down or fail, and Buyer assumes these risks based on Seller's representations, warranties and covenants in this Agreement that are designed to give Buyer a reasonable and fair opportunity to receive the benefit of its bargain. By this Agreement, Seller transfers to Buyer full and complete ownership of the Purchased Amount of Future Receipts and Seller retains no legal or equitable interest therein.

**7. Fees and Charges.** The fees and charges owed by Seller are as described in this Agreement. Some or all of the Origination Fee may be paid to a broker. Otherwise, Buyer is NOT CHARGING ANY BROKER FEES to Seller. If Seller is charged another such fee, Seller acknowledges that it is not being charged by Buyer.

**8. Credit Report and Other Authorizations.** Seller and each of the Guarantors signing below authorize Buyer, its agents and representatives and any credit reporting agency engaged by Buyer, to (i) investigate any references given or any other statements or data obtained from or about Seller or any of the Guarantors for the purpose of this Agreement, (ii) obtain consumer and business credit reports on the Seller and any of its Owners, and (iii) to contact personal and business references provided by Seller to Buyer, at any time now or for so long as Seller and/or Guarantors continue to have any obligations to Buyer as a consequence of this Agreement or for Buyer's ability to determine Seller's eligibility to enter into any future agreement with Buyer.

**9. Authorization to Contact Current and Prior Banks.** Seller authorizes all of its banks and brokers and its Payment Card processor(s) to provide Buyer with Seller's banking, brokerage and/or processing history to determine qualification or continuation in this program, or for collections upon a breach of this Agreement. Seller hereby further authorizes Buyer to contact any current or prior bank of the Seller in order to obtain whatever information it may require regarding Seller's transactions with any such bank. Such information may include but is not limited to, information necessary to verify the amount of Future Receipts previously processed on behalf of Seller and any fees that may have been charged by the bank. In addition, Seller authorizes Buyer to contact any current or prior bank of the Seller for collection purposes and in order to confirm that Seller is exclusively using an Authorized Account for the deposit of all Future Receipts of the Seller.

**10. Right to Cancel.** Seller understands that Buyer offers Seller a right to cancel this Agreement at any time within three calendar days after Buyer has delivered the Net Funded Amount to Seller. Seller may exercise this right by notifying Buyer that it is cancelling this Agreement and paying to Buyer the following amount in immediately available U.S. funds: (a) the Net Funded Amount, and (b) any portion of the Purchase Price that was advanced to third parties. Seller's right to cancel shall be effective only if Buyer receives both the notice and the required payment no later than 5:00 PM Eastern Time on the third calendar day following the date on which Seller received the Net Funded Amount.

**11. Financial Information.** Seller authorizes Buyer and its agents to investigate its financial responsibility and history, and will provide to Buyer any authorizations, banking or financial statements, tax returns, etc., as Buyer deems necessary and reasonable prior to or at any time after execution of this Agreement. A photocopy of this authorization will be deemed acceptable as an authorization for release of financial and credit information. Buyer is authorized to update such information and financial and credit profiles from time to time as it deems appropriate. Seller waives, to the maximum extent permitted by law, any claim for damages against Buyer or any of its affiliates relating to any investigation undertaken by or on behalf of Buyer as permitted by this Agreement or disclosure of information as permitted by this Agreement.

**12. Application of Amounts Received by Buyer.** Buyer reserves the right to apply amounts received by it under this Agreement to any fees or other charges due to Buyer from Seller prior to applying such amounts to reduce the amount of any outstanding Purchased Amount.

**13. Representations, Warranties and Covenants of Seller.** As of the date of this Agreement and, unless expressly stated otherwise, continuing until Buyer has received the Purchased Amount and all fees and charges due under this Agreement, Seller represents, warrants and covenants to Buyer as follows:

a. **No Interference.** Seller must deposit all Future Receipts into an Authorized Account on a daily basis and must instruct Seller's credit card processor, which must be approved by Buyer (the "Processor") to deposit all Payment Card receipts of Seller into an Authorized Account on a daily basis. Seller agrees not to (i) change any Authorized Account without the express written consent of Buyer, (ii) create any new depository account, (iii) revoke Buyer's authorization to debit an Authorized Account, (iv) close an Authorized Account without the express written consent of Buyer or, (v) take any other action that denies, or interferes with, Buyer's rights under this Agreement, including but not limited to Buyer's right to receive its share of revenue received by Seller.

b. **Stacking Prohibited.** Seller shall not, without Buyer's prior written consent, enter into: (a) any other agreement for the sale of Future Receipts, or (b) any loan agreement that encumbers Seller's Future Receipts or requires daily payments. Buyer may share information regarding this Agreement with any third party in order to determine whether Seller is in compliance with this provision.

c. **Financial Condition and Financial Information.** Any bank statements and financial statements of Seller that have been furnished to Buyer, and future statements that will be furnished to Buyer, fairly and accurately represent the financial condition of Seller at such dates. Furthermore, Seller represents that all documents, forms and recorded interviews provided to or with Buyer are true, accurate and complete in all respects, and accurately reflect Seller's financial condition and results of operations at the time they are provided. Seller further agrees to authorize the release of any past or future tax returns to Buyer.

d. **Governmental Approvals.** Seller is in compliance and shall comply with all applicable federal, state and local laws, rules and regulations and has valid permits, authorizations and licenses to own, operate and lease its properties and to conduct the businesses in which it is presently engaged and/or will engage in hereafter.

Docusign Envelope ID: 3D713993-B404-8065-8396-CB48538FEEB6


e. **Authority to Enter Into This Agreement.** Seller and the person(s) signing this Agreement on behalf of Seller, have full power and authority to incur and perform the obligations under this Agreement, all of which have been duly authorized.

f. **Change of Name or Location or Sale or Closing of Business.** Seller will not conduct Seller's businesses under any name other than as disclosed to Buyer or change any of its places of business without prior written consent of Buyer. Seller will not voluntarily sell, dispose, transfer or otherwise convey all or substantially all of its business or assets without (i) the express prior written consent of Buyer, and (ii) the written agreement of any purchaser or transferee assuming all of Seller's obligations under this Agreement pursuant to documentation satisfactory to Buyer. As of the date of this Agreement, Seller does not plan to close its business either temporarily, whether for renovations, repairs or any other purpose, or permanently. Seller will not voluntarily close its business on a temporary basis for renovations, repairs, or any other voluntary purposes. This provision, however, does not prohibit Seller from closing its business temporarily if such closing is required to conduct renovations or repairs that are required by local ordinance or other legal order, such as from a health or fire inspector, or if otherwise forced to do so by circumstances outside of the control of Seller. Prior to any such closure, Seller will provide Buyer 10 calendar days' notice to the extent practicable.

g. **No Pending or Contemplated Bankruptcy as of the Date of this Agreement.** As of the date of this Agreement: (a) Seller has not filed, and does not plan to file, any petition for bankruptcy protection under Title 11 of the United States Code, (b) there has been no involuntary petition brought or pending against Seller, and (c) Seller has not received any communication from any third party indicating that an involuntary petition will be filed against Seller. Seller has not consulted with a bankruptcy attorney or a debt relief organization within six months prior to the date of this Agreement. Seller further warrants that, as of the date of this Agreement, it does not plan to engage the services of a debt relief organization.

h. **Seller to Pay Taxes Promptly.** Seller will promptly pay all necessary taxes and other assessments, including but not limited to employment, sales and use taxes.

i. **No Violation of Prior Agreements.** Seller's execution and performance of this Agreement does not conflict with and will not violate any other agreement, obligation, promise, court order, administrative order or decree, law or regulation to which Seller is subject, including any agreement that prohibits the sale or pledge of Seller's Future Receipts.

j. **Seller's Knowledge and Representation.** Seller represents, warrants, and agrees that it is a sophisticated business entity familiar with the kind of transaction covered by the Agreement; it was represented by counsel or had full opportunity to consult with counsel.

k. **Accurate and Complete Information.** Seller represents, warrants, and agrees that all information provided to Buyer and all statements made to Buyer relating to this transaction in any way have been truthful, accurate, and complete. Seller further agrees that Seller will be truthful in all future statements to Buyer, and will provide Buyer with accurate and complete information regarding Seller's business as required by this Agreement.

l. **Seller as a Commercial Entity.** Seller is a sophisticated business entity familiar with the type of transaction described under this Agreement, and has had a full opportunity to consult with counsel of their choice, and has consulted with counsel or has decided not to avail themselves of that opportunity.

**14. Rights of Buyer.**

a. **Acknowledgment of Security Interest and Security Agreement.** The sale of Future Receipts pursuant to this Agreement shall constitute and shall be construed and treated for all purposes as a true and complete sale from Seller to Buyer, conveying good title to the Future Receipts free and clear of any liens and encumbrances. To the extent the Future Receipts include any "accounts" or "payment intangibles" as those terms are defined in the Uniform Commercial Code as in effect in the state in which the Seller is located ("UCC") then: (i) the sale of such accounts or payment intangibles creates a security interest as defined in the UCC, (ii) this Agreement constitutes a security agreement under the UCC, and (iii) Buyer has all the rights of a secured party under the UCC with respect to such accounts or payment intangibles. Seller further agrees that, with or without a breach of this Agreement, Buyer may notify account debtors, or other persons obligated on the Future Receipts, or holding the Future Receipts, of Seller's sale of the Future Receipts and may instruct them to make payment or otherwise render performance to or for the benefit of Buyer.

b. **Financing Statements.** Seller authorizes Buyer to file one or more UCC-1 forms consistent with the UCC to give notice that the Purchased Amount of Future Receipts is the sole property of Buyer. The UCC filing may state that such sale is intended to be a sale and not an assignment for security and may state that the Seller is prohibited from obtaining any financing that impairs the value of the Future Receipts or Buyer's right to collect same. Seller authorizes Buyer to debit any Authorized Account for all costs incurred by Buyer associated with the filing, amendment or termination of any UCC filings.

c. **Right of Access.** In order to ensure that Seller is complying with the terms of this Agreement, Buyer shall have the right to (i) enter during regular business hours, without notice, the premises of Seller's business for the purpose of inspecting and checking Seller's transaction processing terminals to ensure the terminals are properly programmed to submit and or batch Seller's daily receipts to the Processor and to ensure that Seller has not violated any other provision of this Agreement, (ii) Seller shall provide access to its employees and records and all other items as requested by Buyer; and (iii) have Seller provide information about its business operations, banking relationships, vendors, landlord and other information to allow Buyer to interview any relevant parties.

d. **Phone Recordings and Contact.** Seller agrees that any call between Buyer and Seller, and their agents and employees may be recorded or monitored. Further, Seller agrees that (i) it has an established business relationship with Buyer, its employees and agents and that Seller may be contacted from time-to-time regarding this or other business transactions, (ii) that such communications and contacts are not unsolicited or inconvenient, and (iii) that any such contact may be made at any phone number, email address, or facsimile number given to Buyer by the Seller, its agents or employees, including cellular telephones.

e. **ACH Authorization.** Seller represents and warrants that, with respect to any authorization provided by Seller to permit Buyer to initiate ACH debit or credit entries to an Authorized Account ("ACH Authorization"): (i) each Authorized Account is solely owned by Seller; (ii) any person executing an ACH Authorization on behalf of Seller is an authorized signer on the Authorized Account and has the power and authority to authorize Buyer to initiate ACH transactions to and from the Authorized Account, and (iii) the Authorized Account is a

legitimate, open, and active bank account used solely for business purposes and not for personal, family or household purposes. If an ACH entry is rejected by Seller's bank for any reason other than a stop payment order placed by Seller with its bank, including without limitation insufficient funds, Seller agrees that Buyer may resubmit up to two times any ACH entry that is dishonored. Seller's bank may charge Seller fees for unsuccessful ACH entries. Seller agrees that Buyer will have no liability to Seller for such fees. In the event Buyer makes an error in processing any ACH entry, Seller authorizes Buyer to initiate ACH entries to the applicable Authorized Account to correct the error. Seller acknowledges that the origination of ACH entries to and from an Authorized Account must comply with applicable law and applicable network rules. Seller agrees to be bound by the Rules and Operating Guidelines of Nacha (formerly known as the National Automated Clearing House Association). Seller will not dispute any ACH entry initiated pursuant to an ACH Authorization, provided the entry corresponds to the terms of the ACH Authorization. Seller requests the bank that holds the Authorized Account honor all ACH entries initiated in accordance with an ACH Authorization.

**15. Remedies for Seller's Breach of this Agreement.** If Seller violates or fails to comply with any term or covenant in this Agreement, Buyer may proceed to protect and enforce its rights including, but not limited to, the following:

a. Buyer may increase the Specified Percentage to 100% and may adjust the Periodic Amount to reflect the new Specified Percentage.

b. Buyer shall have the right to collect the full undelivered Purchased Amount plus all fees and charges (including collection and legal fees as more fully described in this Agreement) assessed under this Agreement, which will become due and payable in full immediately.

c. Buyer may enforce the provisions of the Guaranty of Performance against each Guarantor.

d. Buyer may require Seller to pay Buyer all reasonable costs associated with Seller's breach. Buyer may proceed to protect and enforce its rights and remedies by arbitration or lawsuit. In any such arbitration or lawsuit, under which Buyer shall recover judgment against Seller, Seller shall be liable for all of Buyer's costs, including but not limited to all reasonable attorneys' fees and court costs. However, the rights of Buyer under this provision shall be limited as provided in the arbitration provision set forth below.

e. Buyer may debit depository accounts wherever situated by means of ACH debit or facsimile signature on a computer-generated check drawn on any of Seller's banking accounts for all sums due to Buyer.

f. Subject to the arbitration provisions of this Agreement, all rights, powers and remedies of Buyer in connection with this Agreement may be exercised at any time by Buyer after the occurrence of breach, are cumulative and not exclusive, and shall be in addition to any other rights, powers or remedies provided by law or equity.

**16. Modifications, Amendments.** No modification, amendment, waiver or consent of any provision of this Agreement shall be effective unless the same is in writing and signed by Buyer.

**17. Assignment.** Buyer may assign, transfer or sell its rights to receive the Purchased Amount or delegate its duties hereunder, either in whole or in part, with or without prior written notice to Seller.

**18. Personal Guaranty of Performance.** Guarantor agrees to irrevocably, absolutely and unconditionally guarantee to Buyer prompt and complete performance of the following obligations of Seller (the "Guaranteed Obligations"):

a. Seller's obligation to not (i) change the Account, (ii) add an additional Account, (iii) revoke Buyer's authorization to debit the Account, (iv) close the Account without the express written consent of Buyer or (v) take any other action with the intent to interfere with Buyer's right to collect the purchased Future Receipts;

b. Seller's obligation to not conduct Seller's businesses under any name other than as disclosed to Buyer;

c. Seller's obligation to not change any of its places of business without prior written consent by Buyer;

d. Seller's obligation to not voluntarily sell, dispose, transfer or otherwise convey its business or substantially all business assets without (i) the express prior written consent of Buyer, and (ii) the written agreement of any purchaser or transferee assuming all of Seller's obligations under this Agreement pursuant to documentation satisfactory to Buyer;

e. Seller's obligation to not enter into any merchant cash advance or any loan agreement that relates to or encumbers its Future Receipts with any party other than Buyer for the duration of this Agreement without Buyer's prior written consent; and

f. Seller's obligation to provide truthful, accurate, and complete information as required by this Agreement.

**19. Guarantor Waivers.** Buyer does not have to notify Guarantor of any of the following events and Guarantor will not be released from its obligations under the Agreement and this Personal Guaranty of Performance if it is not notified of: (i) Seller's failure to timely perform any obligation under the Agreement, (ii) any adverse change in Seller 's financial condition or business, (iii) Buyer's acceptance of the Agreement, and (iv) any renewal, extension or other modification of the Agreement or Seller 's other obligations to Buyer. In addition, Buyer may take any of the following actions without releasing Guarantor from any of its obligations under the Agreement and this Performance Guaranty: (i) renew, extend or otherwise modify the Agreement or Seller's other obligations to Buyer, and (ii) release Seller from its obligations to Buyer. Guarantor shall not seek reimbursement from Seller or any other guarantor for any amounts paid by it under the Agreement or this Performance Guaranty. Guarantor permanently waives and shall not seek to exercise any of the following rights that it may have against Seller, or any other guarantor, for any amounts paid by it, or acts performed by it, under the Agreement or this Performance Guaranty: (i) subrogation, (ii) reimbursement, (iii) performance, (iv) indemnification, or (v) contribution.

**20. Guarantor Acknowledgement**. Guarantor acknowledges that Guarantor understands the seriousness of the provisions of the Agreement, including the Jury Waiver, Class Action Waiver and Arbitration sections, and has had a full opportunity to consult with counsel their choice, and have consulted with counsel or have decided not to avail themselves of that opportunity.

**21. Multiple Sellers.** If more than one person or entity is listed as a Seller above, then the term "Seller" refers collectively to all Sellers who have signed the signature page of this Agreement. The term "Future Receipts" refers to the Future Receipts of each Seller and the calculation of the initial Periodic Amount and any adjustment to the Periodic Amount shall be based on an aggregate of the actual or projected sales revenue of all the Sellers. Each Seller agrees that Buyer's purchase of Future Receipts hereunder constitutes a purchase of the Future Receipts of all the Sellers. Each Seller agrees that it is jointly and severally liable to Buyer for the obligation to deliver the Purchased Amount from its own Future Receipts. Each Seller agrees that the release of any other Seller from any obligations under this Agreement, whether in whole or in part, will not limit, reduce, release, or impair such Seller's obligations to Buyer, including the obligation to deliver the undelivered balance of the Purchased Amount. Each Seller designates the Primary Contact Person identified above as its authorized representative for all purposes related to this Agreement and any related transactions. Buyer may treat any notice or instruction received from the Primary Contact Person as a notice or instruction from all Sellers.

**22. Notices.**

a. **Notices from Buyer.** Buyer may send any notices, disclosures, terms and conditions, other documents, and any future changes to Seller and Guarantor (as applicable) by regular mail or (at Buyer's option) by e-mail to the Primary Contact Person. Seller and each Guarantor agrees that the Primary Contact Person is authorized to receive all communications on behalf of Seller and each Guarantor. Notices sent by e-mail are effective when sent. Notices sent by regular mail become effective three days after mailing to the Primary Contact Person at the address set forth above or such new address communicated by the Primary Contact Person to Buyer pursuant to this Section.

b. **Notices from Seller and Guarantor.** Unless another method of notice to Buyer is specifically described in this Agreement, Seller and Guarantor may send any notices to Buyer by e-mail only upon the prior written consent of Buyer, which consent may be withheld or revoked at any time in Buyer's sole discretion. Otherwise, any notices or other communications from Seller and Guarantor to Buyer must be delivered by certified mail, return receipt requested, to Buyer at 33 E33rd Street, New York, NY 10016. Notices sent to Buyer shall become effective only upon receipt by Buyer.

**23. Binding Effect, Governing Law, Venue and Jurisdiction.** This Agreement shall be binding upon and inure to the benefit of Seller, Buyer, Guarantor and their respective successors and assigns, except that neither Seller nor Guarantor shall have the right to assign its respective rights hereunder or any interest herein without the prior written consent of Buyer which consent may be withheld in Buyer's sole discretion. Except as set forth in the Arbitration section, this Agreement shall be governed by and construed in accordance with the laws of the state of New York, without regard to any applicable principles of conflicts of law. Each Seller and Guarantor understands and agrees that (i) Buyer is located in New York, (ii) Buyer makes all decisions from Buyer's office in New York, (iii) the Agreement is made in New York (that is, no binding contract will be formed until Buyer receives and accepts Seller's signed Agreement in New York, and (iv) Seller's payments are not accepted until received by Buyer in New York. Any suit, action or proceeding arising hereunder, or the interpretation, performance or breach of this Agreement, shall, if Buyer so elects, be instituted in any court sitting in New York, (the "Acceptable Forums"). Each Seller and Guarantor agrees that the Acceptable Forums are convenient to it, and submit to the jurisdiction of the Acceptable Forums and waives any and all objections to jurisdiction or venue. Should such proceeding be initiated in any other forum, each Seller and Guarantor waives any right to oppose any motion or application made by Buyer to transfer such proceeding to an Acceptable Forum. Unless prohibited by law, Buyer, Seller and Guarantor further agree that the mailing by certified or registered mail, return receipt requested, of any process required by any such court will constitute valid and lawful service of process against them, without the necessity for service by any other means provided by statute or rule of court, but without invalidating service performed in accordance with such other provisions.

**24. Survival of Representations, Warranties and Covenants.** All representations, warranties and covenants herein shall survive the execution and delivery of this Agreement and shall continue in full force until all obligations under this Agreement shall have been satisfied in full.

**25. Interpretation.** All parties hereto have had the opportunity to review this Agreement with an attorney of their own choosing and have relied only on their own attorney's guidance and advice or have been provided sufficient opportunity to have an attorney of their choosing review the Agreement. No construction determinations shall be made against either Party hereto as drafter.

**26. Entire Agreement and Severability.** This Agreement embodies the entire agreement between Seller and Buyer and supersedes all prior agreements and understandings relating to the subject matter hereof. In case any of the provisions in this Agreement is found to be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of any other provision contained herein shall not in any way be affected or impaired.

**27. Execution.** Facsimile signatures, or any other electronic means reflecting the party's signature hereto, shall be deemed acceptable for all purposes. The parties agree that if a duly authorized representative of each of the parties signs this Agreement and transmits such Agreement to the other party via facsimile or electronically transmitted portable document format, such transmission shall be treated in all manner and respects as an original signature (or counterpart thereof) and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. At the request of a party hereto, each other party hereto shall re-execute original forms thereof and deliver them to all other parties. No party hereto shall raise the use of a facsimile machine or electronic transmission in portable document format to deliver a signature or the fact that any signature was transmitted or communicated through the use of facsimile machine or electronic transmission in portable document format as a defense to this Agreement and each such party forever waives any such defense. This Agreement may be signed in one or more counterparts, each of which shall constitute an original and all of which when taken together shall constitute one and the same agreement.

**28. Monitoring, Recording, and Solicitations.**

a. **Authorization to Contact by Phone.** Seller and Guarantor authorize Buyer, its affiliates, agents and independent contractors to contact Seller or Guarantor at any telephone number Seller or Guarantor provide to Buyer or from which Seller or Guarantor places a call to Buyer, or any telephone number where Buyer believes it may reach Seller or Guarantor, using any means of communication, including but not limited to calls or text messages to mobile, cellular, wireless or similar devices or calls or text messages using an automated telephone dialing system and/or artificial voices or prerecorded messages, even if Seller or Guarantor incurs charges for receiving such communications.

b. **Authorization to Contact by Other Means.** Seller and Guarantor also agree that Buyer, its affiliates, agents and independent contractors, may use any other medium not prohibited by law including, but not limited to, mail, e-mail and facsimile, to contact Seller and Guarantor. Seller and Guarantor expressly consent to conduct business by electronic means.

**29. JURY WAIVER. THE PARTIES WAIVE THE RIGHT TO A TRIAL BY JURY IN ANY COURT IN ANY SUIT, ACTION OR PROCEEDING ON ANY MATTER ARISING IN CONNECTION WITH OR IN ANY WAY RELATED TO THE TRANSACTIONS OF WHICH THIS AGREEMENT IS A PART OR ITS ENFORCEMENT, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. THE PARTIES ACKNOWLEDGE THAT EACH PARTY MAKES THIS WAIVER KNOWINGLY, WILLINGLY AND VOLUNTARILY AND WITHOUT DURESS, AND ACKNOWLEDGE THEIR RIGHT TO REVIEW THE RAMIFICATIONS OF THIS WAIVER WITH THEIR ATTORNEYS.**

**30. CLASS ACTION WAIVER. BUYER, SELLER, AND EACH GUARANTOR ACKNOWLEDGE AND AGREE THAT THE AMOUNT AT ISSUE IN THIS TRANSACTION AND ANY DISPUTES THAT ARISE BETWEEN THEM ARE LARGE ENOUGH TO JUSTIFY DISPUTE RESOLUTION ON AN INDIVIDUAL BASIS. EACH PARTY HERETO WAIVES ANY RIGHT TO ASSERT ANY CLAIMS AGAINST THE OTHER PARTIES AS A REPRESENTATIVE OR MEMBER IN ANY CLASS OR REPRESENTATIVE ACTION, EXCEPT WHERE SUCH WAIVER IS PROHIBITED BY LAW OR DEEMED BY A COURT OF LAW TO BE AGAINST PUBLIC POLICY. TO THE EXTENT ANY PARTY IS PERMITTED BY LAW OR A COURT OF LAW TO PROCEED WITH A CLASS OR REPRESENTATIVE ACTION AGAINST THE OTHER, THE PARTIES AGREE THAT: (I) THE PREVAILING PARTY SHALL NOT BE ENTITLED TO RECOVER ATTORNEYS' FEES OR COSTS ASSOCIATED WITH PURSUING THE CLASS OR REPRESENTATIVE ACTION (NOT WITHSTANDING ANY OTHER PROVISION IN THIS AGREEMENT), AND (II) THE PARTY WHO INITIATES OR PARTICIPATES AS A MEMBER OF THE CLASS WILL NOT SUBMIT A CLAIM OR OTHERWISE PARTICIPATE IN ANY RECOVERY SECURED THROUGH THE CLASS OR REPRESENTATIVE ACTION.**

**31. ARBITRATION. IF BUYER, SELLER OR ANY GUARANTOR REQUESTS, THE OTHER PARTIES AGREE TO ARBITRATE ALL DISPUTES AND CLAIMS ARISING OUT OF OR RELATING TO THIS AGREEMENT. IF BUYER, SELLER OR ANY GUARANTOR SEEKS TO HAVE A DISPUTE SETTLED BY ARBITRATION, THAT PARTY MUST FIRST SEND TO ALL OTHER PARTIES, BY CERTIFIED MAIL, A WRITTEN NOTICE OF INTENT TO ARBITRATE. BUYER, SELLER OR ANY GUARANTOR MAY THEN COMMENCE AN ARBITRATION PROCEEDING WITH THE AMERICAN ARBITRATION ASSOCIATION ("AAA") OR THE FORUM. BUYER WILL PROMPTLY REIMBURSE SELLER OR GUARANTOR FOR ANY ARBITRATION FILING FEE, HOWEVER, IN THE EVENT THAT BOTH SELLER AND GUARANTOR MUST PAY FILING FEES, BUYER WILL ONLY REIMBURSE SELLER'S ARBITRATION FILING FEE AND, EXCEPT AS PROVIDED IN THE NEXT SENTENCE, BUYER WILL PAY ALL ADMINISTRATION AND ARBITRATOR FEES. IF THE ARBITRATOR FINDS THAT EITHER THE SUBSTANCE OF THE CLAIM RAISED BY SELLER OR GUARANTOR OR THE RELIEF SOUGHT BY SELLER OR GUARANTOR IS IMPROPER OR NOT WARRANTED, AS MEASURED BY THE STANDARDS SET FORTH IN FEDERAL RULE OF PROCEDURE 11(B), THEN BUYER WILL PAY THESE FEES ONLY IF REQUIRED BY THE AAA OR FORUM RULES. SELLER AND GUARANTOR AGREE THAT, BY ENTERING INTO THIS AGREEMENT, THEY ARE WAIVING THE RIGHT TO TRIAL BY JURY. BUYER, SELLER OR ANY GUARANTOR MAY BRING CLAIMS AGAINST ANY OTHER PARTY ONLY IN THEIR INDIVIDUAL CAPACITY, AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. FURTHER, BUYER, SELLER AND ANY GUARANTOR AGREE THAT THE ARBITRATOR MAY NOT CONSOLIDATE PROCEEDINGS FOR MORE THAN ONE PERSON'S CLAIMS, AND MAY NOT OTHERWISE PRESIDE OVER ANY FORM OF A REPRESENTATIVE OR CLASS PROCEEDING, AND THAT IF THIS SPECIFIC PROVISION DEALING WITH THE PROHIBITION ON CONSOLIDATED, CLASS OR AGGREGATED CLAIMS IS FOUND UNENFORCEABLE, THEN THE ENTIRETY OF THIS ARBITRATION CLAUSE SHALL BE NULL AND VOID. THIS AGREEMENT TO ARBITRATE IS GOVERNED BY THE FEDERAL ARBITRATION ACT AND NOT BY ANY STATE LAW REGULATING THE ARBITRATION OF DISPUTES. THIS AGREEMENT IS FINAL AND BINDING EXCEPT TO THE EXTENT THAT AN APPEAL MAY BE MADE UNDER THE FAA. ANY ARBITRATION DECISION RENDERED PURSUANT TO THIS ARBITRATION AGREEMENT MAY BE ENFORCED IN ANY COURT WITH JURISDICTION. THE TERMS "DISPUTES" AND "CLAIMS" SHALL HAVE THE BROADEST POSSIBLE MEANING.**

**32. RIGHT TO OPT OUT OF ARBITRATION. SELLER AND GUARANTOR(S) MAY OPT OUT OF THE ARBITRATION PROVISION ABOVE. TO OPT OUT OF THE ARBITRATION CLAUSE, SELLER AND EACH GUARANTOR MUST SEND BUYER A NOTICE THAT THE SELLER AND EACH GUARANTOR DOES NOT WANT THE CLAUSE TO APPLY TO THIS AGREEMENT. FOR ANY OPT OUT TO BE EFFECTIVE, SELLER AND EACH GUARANTOR MUST SEND AN OPT OUT NOTICE TO THE FOLLOWING ADDRESS BY REGISTERED MAIL, WITHIN 14 DAYS AFTER THE DATE OF THIS AGREEMENT: ORCAFUNDING LLC, 33 E33RD STREET, NEW YORK, NY 10016, ATTENTION: LEGAL DEPT.**

***[SIGNATURES ON FOLLOWING PAGE]***

**Signature Page to Sale of Future Receipts Agreement**

**Agreement of Seller:** By signing below Seller agrees to the terms and conditions contained in this Agreement, and further agrees that this transaction is for business purposes.

Seller: PINE FOREST CAMPCO LLC & 11200 WEST FLORISSANT AVENUE REALTY LLC & THE ENTITIES LISTED ON EXHIBIT A

Name: Michael A Shabsels

Title: Owner/Manager

By: DocuSigned by: Michael Shabsels BCBB5FD96F7645C... (signature)

**Agreement of Guarantor:** By signing below each Guarantor agrees to the terms and conditions contained in this Agreement, and further agrees that this transaction is for business purposes.

Notice: This Agreement contains a guaranty of performance, and by signing below, you agree that you will be personally liable for the prompt and complete performance of the Guaranteed Obligations as described in the Personal Guaranty of Performance (Section 19 of this Agreement).

Guarantor Name: Michael A Shabsels Guarantor Signature: DocuSigned by: Michael Shabsels BCBB5FD96F7645C...

Guarantor Name: David Arthur Shabsels Guarantor Signature: DocuSigned by: David Shabsels 69B4BC0438C3408...

**AUTHORIZATION AGREEMENT**
**FOR AUTOMATED CLEARING HOUSE TRANSACTIONS**

This Authorization Agreement is provided to OrcaFunding LLC ("Buyer") by each Seller identified on the Signature Page to this Authorization Agreement. This Authorization Agreement is provided pursuant to the Sale of Future Receipts Agreement (the "Sale Agreement") entered into between such Seller and the Buyer. Capitalized terms used in this Authorization Agreement without definition shall have the meanings set forth in the Sale Agreement.

By signing this Authorization Agreement, each Seller agrees to the following:

Seller hereby authorizes Buyer to present automated clearing house (ACH) debits to the account identified on the Signature Page to this Authorization Agreement in the amount of any Periodic Amount due on a Remittance Day, or any other amount due to Buyer from Seller (or otherwise authorized to be debited) under the terms of the Sale Agreement, as it may be amended, supplemented or replaced from time to time. Seller acknowledges that each such identified account is an "Authorized Account" as defined in the Sale Agreement. Seller also authorizes Buyer to initiate credit entries to deliver the Net Funded Amount to Seller and authorizes Buyer to initiate additional entries (debits and credits) to any Authorized Account to correct any erroneous transfers.

If Seller breaches the Sale Agreement, Seller authorizes Buyer to debit any and all accounts controlled by Seller or controlled by any entity with the same Federal Tax Identification Number as Seller up to the total amount, including but not limited to, all fees and charges, due to Buyer from Seller under the terms of the Sale Agreement.

Seller authorizes Buyer to contact Seller's financial institution to obtain available funds information and/or to verify any information Seller has provided about the Authorized Account and to correct any missing, erroneous or out-of-date information.

Seller represents and warrants that each Authorized Account is established and used primarily for commercial/business purposes, and not for consumer, family or household purposes. Seller agrees to be bound by the Rules and Operating Guidelines of Nacha. Seller understands and agrees that any revocation or attempted revocation of this Authorization Agreement will constitute a breach of the Sale Agreement. In the event that Seller closes an Authorized Account, or the Authorized Account has insufficient funds for any ACH transaction under this Authorization Agreement, Seller authorizes Buyer to contact Seller's financial institution and obtain information (including account number, routing number and available balance) concerning any other deposit account(s) maintained by Seller with Seller's financial institution, and to initiate ACH transactions under this Authorization Agreement to such additional account(s). To the extent necessary, Seller grants Buyer a limited Power of Attorney to take action in Seller's name to facilitate this Authorization Agreement.

Seller understands that the Authorization Agreement is a fundamental condition to induce Buyer to enter into the Sale Agreement. Consequently, this Authorization Agreement is intended to be irrevocable during the course of the Sale Agreement and shall remain in full force and effect until Buyer has received all amounts due or that may become due to Buyer under the Sale Agreement.

[Signature Page follows]

Docusign Envelope ID: 3D713993-B404-8065-8396-CB48538FEEB6

ORCA FUNDING

**Signature Page to Authorization Agreement**

By signing below, each Seller represents that it is the holder of the account identified immediately above its signature, and agrees that such account is an "Authorized Account" account as described in the Authorization Agreement.

| | |
|---|---|
| **Account Name: (Name of account exactly as it appears on Seller's bank statement)** | Pine Forest Campco LLC & 11200 West Florissant Avenue Realty LLC & the entities listed on Exhibit A |
| **Bank Name:** | Bank of America & the Banks listed on Exhibit A |
| **ABA Transit/Routing Number:** | [redacted] |
| **Account Number:** | [redacted] & the accounts listed on Exhibit A |
| **Seller Signature** | PINE FOREST CAMPCO LLC & 11200 WEST FLORISSANT AVENUE REALTY LLC & THE ENTITIES LISTED ON EXHIBIT A<br>DocuSigned by:<br>Signature: Michael Shabsels<br>BCBB5FD96F7645C...<br>Name/Title of signer: Michael A Shabsels |

ORCAFUNDING

**EXHIBIT A**

The following entities are hereby incorporated by reference, made a part of, and parties to, the merchant agreement dated April 17, 2026, by and between OrcaFunding and Pine Forest Campco LLC & 11200 West Florissant Avenue Realty LLC (the "**Agreement**"). Specifically, the following entities, together with Pine Forest Campco LLC & 11200 West Florissant Avenue Realty LLC are all collectively referred to as **"Seller"** in the Agreement:

Entity Names

SplashDown Beach Operatingco LLC
1000 Acres Holdings, LLC
1133 Northwest L Street Leasing LLC
1133 Northwest L Street Real Estate LLC
12 Cambridge Drive Realty LLC
1750 Wells Real Estate LLC
250 Progressive Leasing LLC
4800 USH 280 Leasing LLC
8014 BayBerry Road Real Estate LLC
Achim Landco LLC
Achim Operatingco LLC
Bahs Holdings LLC
Bahs Operation Inc
Banner Landco LLC
Banner Operationco LLC
Bayberry Wells Leasing LLc
Belgrade Lakes Summer Camps LLC
Bluestar Landco LLC
Bluestar Operationgco LLC
Camp Med-o-lark inc
Central Park Holdings LLC
Club Getaway Landco LLC
Club Getaway Operatingco LLC
Country Roads Landco LLC
Country Roads Operatingco LLC
Damis Holdings LLC
GR Travel LLC
Green Lane Landco LLC
IAFA Operating Co LLC
IAFALandco LLC
Kiwi Landco LLC
Kiwi Operatingco LLC
Lavco LLC
Lavland LLC
Maine Wekeela Co LLC
Malka Operatingco LLC
Meadowbrook Landco LLC
Meadowbrook Operatingco LLC
Mesorahco LLC
Mesorahland LLC
Mogenavco LLC
Mogenavland LLC
Mohawkcampco LLC
Mohawkland LLC
Nettleton Manor Holdings LLC
Poland Campco LLC
Poland Landco LLC
RDM Camps LLC
Shab Holdings LLC
Shab Operating Inc
Simad Holdings LLC
Stony Creek Operating CO LLC
Summit Camp LLc
Washington Lake LLC
Waukeela Landco LLC
Waukeela Operatingco LLC
Wekeeland LLC
West Florida Ventures LLC
Willow Lake Day Camps LLC
WM Camp LLC
WM Land LLC
Mega Funworks Inc
Tee Bar Corp
Waukeeland LLC
Rolling Hills Operating CO LLc
Eagle's Landing Day Camp LLC
2195 Harlem Road Leasing LLC
2195 Harlem Road Real Estate LLC
South Loop West Leasing LLC
South Tri Management LLC
Willow Lake Land Corporation
7335 Gladiolus LLC
Stony Creek Operatingo Co LLC
3385 Newmark Drive LLC
194 Washington Avenue Real Estate LLC
1912 Memorial Drive Real Estate LLC
149 Emerald Street Real Estate LLC
635 Gravois Road Real Estate LLC
2203 Grand Canal Boulevard Real Estate LLC
201 Centre Drive Real Estate LLC
1800 North Rockwell Avenue Real Estate LLC
4215 SE 53rd Street Real Estate LLC
2547 Brindle Drive Real Estate LLC
1101 East Glendale Boulevard Real Estate LLC
5707 MacCorkle Avenue Real Estate LLC
7650 FM78 Real Estate LLC
Matteson Center Real Estate LLC
1135 East Chocolate Avenue Real Estate LLC
2434 South Interstate 35E Real Estate LLC
771 Corporate Drive Real Estate LLC
3413 Tittabawassee Road Real Estate LLC
200 Great Pond Drive Real Estate LLC
Meshorahland LLC
Oklahoma Wilshire Lofts Real Estate LLC
4650 Westway Park Boulevard Real Estate LLC
East Hartford Properties Real Estate LLC
90 Pleasant Valley Street Real Estate LLC
4328 Bay Road Real Estate LLC
Fairplain Plaza Real Estate LLC
South Loop West Real Estate LLC
Turnpike Road Holdings LLC
1323 Augusta West Parkway Real Estate LLC
45 Commerce Drive Real Estate LLC
400 Greens Road Real Estate LLC
1600 Eastchase Parkway Real Estate LLC
44 Southpoint Real Estate LLC
2974 Coppercreek Road Real Estate LLC
Quadstar Realty LLC
Bahs Operating INC
Dasmas Landco LLC
Highland Fishkill Leisure Equties LLC
Greenpoint Equty Holiding LLC
90 Pleasant Valley Road Leasing LLC
Milton 4650 Westway Park Boulevard LLC
830 Country Road 64 Leasing LLC
Pine Forest Operatingco LLC
55 Merlino Drive Real Estate LLC

ORCA FUNDING

**EXHIBIT A (cont.)**

Rocking Horse Ranch Operatingco LLC
SplashDown Beach Landco LLC
830 County Road 64 Real Estate LLC
2302 Windsong Drive Real Estate LLC
Woodlands Eagle Timber Real Estate LLC
11200 West Florissant Avenue Leasing LLC
194 Washington Avenue Leasing LLC
149 Emerald Street Leasing LLC
635 Gravois Road Leasing LLC
2203 Grand Canal Boulevard Leasing LLC
201 Centre Drive Leasing LLC
2547 Brindle Drive Leasing LLC
1101 East Glendale Boulevard Leasing LLC
5707 MacCorkle Avenue Leasing LLC
7650 FM78 Leasing LLC
Matteson Center Leasing LLC
1135 East Chocolate Avenue Leasing LLC
2434 South Interstate 35E Leasing LLC
771 Corporate Drive Leasing LLC
3413 Tittabawassee Road Leasing LLC
200 Great Pond Drive Leasing LLC
Oklahoma Wilshire Lofts Leasing LLC
East Hartford Properties Leasing LLC
90 Pleasant Valley Street Leasing LLC
4328 Bay Road Leasing LLC
Fairplain Plaza Leasing LLC
1323 Augusta West Parkway Leasing LLC
45 Commerce Drive Leasing LLC
400 Greens Road Leasing LLC
1600 Eastchase Parkway Leasing LLC
44 Southpoint Leasing LLC
2974 Coppercreek Road Leasing LLC
55 Merlino Drive Leasing LLC
Rocking Horse Ranch Landco LLC
Splashdown Beach Landco LLC
830 County Road 64 Leasing LLC
2302 Windsong Drive Leasing LLC
Woodlands Eagle Timber Leasing LLC
WG Operatingco LLC
Mill Road Landco LLC
Mainewekeelaco LLC
Bright Power, Inc
Shabsels Management LLC
Shabsels Management Trust
Shabsels Gift LLC
Island Lake Campco LLC
Island Lake Landco LLC
11200 West Florissant Avenue Realty LLC
Greenvilleland LLC
Ekostinger, Inc.
Simad Ventures LLC
12 Cambridge Drive Leasing LLC
348 Morris Avenue Real Estate LLC
Catskills Wine And Food Festival LLC
Mrj Realty LLC
Pine Forest Landco LLC
Aedm Real Estate Holdings LLC
Chateaugay Campco LLC
4800 Ush 280 Real Estate LLC
1401 Us Highway 49b Real Estate LLC
Damis Ventures LLC
100 Mile Fund, LLC
The Light Phone Inc.
Chateaugay Landco LLC
Green Lane Operatingco, LLC
Montclair Condo Holdings LLC
Highland Park Partners LLC
4650 Westway Park Boulevard Leasing LLC
Southwest Ohio Associates LLC
Rolling Hills Landco LLC
Vytalize Health, LLC
Belmont Apartments Partners LLC
Mohawk Country Day School, Inc.
Banner Operatingco LLC Dba Banner Day Camp
1168 Jacaranda Real Estate LLC
West Florida Associates LLC
5719 NW 13th Street LLC
1168 Jacaranda LLC
1168 Jacaranda Leasing LLC
Blue Star Camps for Boys & Girls
9 Farm Springs Leasing LLC
9 Farm Springs Real Estate LLC
Dico Camps Inc Dba Campo Lokanda
Windsor Mountain International, Inc.
Camp Kent LLC
Camp Chen-A-Wanda
Pine Forest Camps Inc
Camp Lavi
Milton 2434 South I-35 LLC
Milton 7650 Fm 78 LLC
Secondary Paragould LLC
Blue Star Camps
Mohawk Day Camp
Optimatum Management LLC
Creative Wave Capital LLC
Splashtown Beach Operatingco
250 Progressive Real Estate LLC

Bank information

| Bank Name | Account Number |
|---|---|
| JPmorgan Chase | [redacted] |
| Bank of America | [redacted], [redacted], [redacted], [redacted], [redacted], [redacted] |
| NBT Bank | [redacted], [redacted], [redacted], [redacted], [redacted] |
| Byline Bank | [redacted], [redacted] |
| Wayne Bank | [redacted], [redacted] |
| TD Bank | [redacted], [redacted], [redacted], [redacted] |
| M&T Bank | [redacted] |
| First Bank | [redacted] |
| Old National Bank | [redacted] |

Name/Title of signer: Michael A Shabsels    Signature: DocuSigned by: Michael Shabsels BCBB3FD96F7645C...

Name/Title of signer: David Arthur Shabsels    Signature: DocuSigned by: David Shabsels 69B4BC0438C5406...

## Early Delivery Schedule

Subject to the conditions described in the Agreement, if during any Early Delivery Window described below, the sum of all Future Receipts that Seller has delivered to Buyer by Seller is equal to the applicable Discounted Purchase Amount described below, then Buyer will accept the Discounted Purchase Amount in full satisfaction of Seller's contractual obligations under the Agreement.

| **EARLY DELIVERY WINDOW**<br><br>Calendar days immediately following disbursement of funds | **DISCOUNTED PURCHASE AMOUNT** |
|---|---|
| 0-30 days | $1,120,000.00 |
| 31-60 days | $1,170,000.00 |
| 61-90 days | $1,210,000.00 |

Seller's right to exercise the Early Delivery Option is subject to the following conditions (unless waived in writing by Buyer):

- None of the funds used to pay the Discounted Purchase Amount have been obtained from Buyer.
- None of the funds used to pay the Discounted Purchase Amount have been obtained from a third party Merchant Cash Advance funder.
- Seller is not in breach of this Agreement at the time Seller exercises the Early Delivery Option.
- Seller must remit (and Buyer must receive) funds in the amount of the applicable Discounted Purchase Amount not later than 11:59 pm of the last date of the applicable Early Delivery Window.
- If Seller wires funds to pay the Discounted Purchase Amount Seller must do so in accordance with instructions provided by Buyer. (Contact Buyer for the payment options.)

Seller's right to exercise the Early Delivery Option terminates immediately after the last day of the last Early Delivery Window.

ADDENDUM TO MERCHANT CASH ADVANCE AGREEMENT

**THIS ADDENDUM** (this "Addendum") is made and entered into as of April 17, 2026 (the "Addendum Effective Date"), by and among OrcaFunding LLC as buyer/purchaser ("Buyer"), Damis Holdings LLC as seller ("Seller"), each additional seller, merchant, or seller-related entity identified in the Agreement (if any, and together with Seller, collectively, "Sellers"), and each undersigned guarantor (each, a "Guarantor" and collectively, "Guarantors"), and supplements and amends that certain Sale of Future Receipts Agreement dated April 17, 2026 (as amended, restated, supplemented or otherwise modified from time to time, the "Agreement").

**WHEREAS**, Buyer entered into the Agreement in reliance upon, among other things, the pricing, risk profile, capital structure, and financing conduct of Sellers, Guarantors, and their related and controlled entities;

**WHEREAS**, Buyer requires contractual price protection if Sellers, Guarantors, or related/controlled entities later obtain capital on shorter-duration than the terms applicable under the Agreement; and

**WHEREAS**, the parties desire to amend the Agreement upon the terms set forth in this Addendum.

**NOW, THEREFORE**, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

**1. Incorporation; Priority; Ratification.**

1.1 The Agreement and all related performance guaranties, ACH authorizations, schedules, riders, and other documents executed in connection therewith are incorporated herein by reference as though fully set forth herein.
1.2 Except as expressly modified by this Addendum, the Agreement and all related documents remain unchanged and in full force and effect, and are hereby ratified and reaffirmed.
1.3 In the event of any conflict, inconsistency, or ambiguity between this Addendum and the Agreement this Addendum shall govern and control.

**2. Defined Terms.**

2.1 All capitalized terms used but not defined in this Addendum shall have the meanings assigned to them in the Agreement.
2.2 For purposes of this Addendum only:
(a) "Covered Person" means, collectively, each of the following, whether now existing or hereafter formed, acquired, merged, consolidated, or otherwise identified: (i) any Seller; (ii) any seller entity, operating entity, DBA, affiliated seller entity, or other Seller-related entity listed or identified anywhere in the Agreement or in any rider, schedule, guaranty, or related document; (iii) any Guarantor; (iv) any Person directly or indirectly owned or controlled by any Guarantor; and (v) any Person directly or indirectly owned or controlled by any Seller or by any entity described in clause (ii).
(b) "Control" or "controlled" means the direct or indirect power to direct or cause the direction of management or policies of a Person, whether through ownership, voting power, contract, or otherwise. "Owned" means direct or indirect beneficial ownership of more than fifty percent (50%) of the equity interests, voting interests, or economic interests of a Person.
(c) "Person" means any individual, sole proprietorship, corporation, limited liability company, partnership, joint venture, trust, estate, association, governmental authority, or other entity of any kind.
(d) "Subsequent Financing" means any merchant cash advance, purchase or sale of future receipts or receivables, receivables financing or purchase agreement, revenue-based financing, working capital advance, business loan, commercial financing arrangement, or similar financing product or capital transaction, whether structured or characterized as a purchase, sale, advance, loan, or otherwise, including any renewal, extension, amendment, modification, refinancing, consolidation, replacement, or upsizing thereof.
(e) "Agreement Funding Amount" means the Purchase Price funded by Buyer to Sellers under the Agreement.
(f) "Current Agreement Duration" means, solely for purposes of comparison and repricing under this Addendum, the then-applicable stated, scheduled, projected, estimated, or reasonably implied remittance, collection, or repayment duration of the Agreement after giving effect to this Addendum and each prior adjustment made pursuant to this Addendum. If the Agreement does not expressly state a duration, then Current Agreement Duration means the good-faith estimated collection period reasonably implied by the then-current recurring remittance settings and the then-current remaining Purchased Amount under the Agreement. For the avoidance of doubt, this definition is used only for comparison and repricing under this Addendum and shall not be construed to create a fixed repayment term, eliminate contingency, or narrow any reconciliation, true-up, or adjustment right provided in the Agreement.
(i) "Triggering Subsequent Transaction" means any Subsequent Financing entered into, consummated, renewed, amended, modified, extended, refinanced, consolidated, replaced, or otherwise effected by any Covered Person on or after the effective date of the Agreement that has a duration shorter than the Current Agreement Duration.
(j) For the avoidance of doubt, a Subsequent Financing shall not constitute a Triggering Subsequent Transaction, and shall not cause any automatic adjustment under this Addendum, to the extent it has: (i) the same duration as the then-current Agreement terms; or (ii) a longer duration than the then-current Agreement terms.

**3. Automatic Price Protection; Self-Executing Amendment.**

3.1 Immediately upon the occurrence of each Triggering Subsequent Transaction, and without any further notice, consent, signature, amendment, or other action by any party, the Agreement shall automatically and self-executingly be deemed amended as follows:

(a) the Current Agreement Duration shall automatically be reduced to equal the duration of such Triggering Subsequent Transaction, but only if and to the extent such duration is shorter than the then-current Current Agreement Duration;
(b) if subsection 3.1(a) applies, then the weekly payment amount corresponding to the Purchased Amount (or equivalent total remittance/payback amount) under the Agreement shall automatically be recalculated to equal the what the weekly payment should be based on the duration of the Triggering Subsequent Transaction. Specifically, the Purchased Amount of the Agreement shall be divided by the number of weeks in the duration of the Triggering Subsequent Transaction, and the resulting number shall be the new weekly payment amount going forward until the Purchased Amount has been received in full.;
(c) Buyer is hereby irrevocably authorized, effective immediately upon the occurrence of the Triggering Subsequent Transaction, to revise, increase, implement, and collect the recurring weekly ACH debit amount under the Agreement to the amount that Buyer reasonably and in good faith, using commercially reasonable assumptions and methodologies consistent with the Agreement, determines is appropriate to reflect the adjusted Current Agreement Duration and the then-current remaining Purchased Amount under the Agreement; and
(d) all payment authorizations granted by Sellers under the Agreement shall be deemed to authorize any revised recurring debit or remittance amount implemented pursuant to this Addendum, without the need for any further authorization.
3.2 Preservation of Reconciliation and Adjustment Rights. Notwithstanding anything herein to the contrary, any revised recurring debit or remittance amount established under this Addendum shall remain subject to all reconciliation, true-up, adjustment, and analogous rights and procedures contained in the Agreement, all of which are hereby preserved, ratified, and reaffirmed and shall continue in full force and effect after every adjustment under this Addendum.
3.3 Cumulative and Unlimited Operation. The mechanism set forth in this Addendum is continuing, cumulative, and unlimited in number. There shall be no cap on the number of automatic adjustments that may occur. Each later Triggering Subsequent Transaction shall be measured against the then-current terms of the Agreement as already adjusted under this Addendum, and the Agreement shall automatically be adjusted again whenever and as often as a later Triggering Subsequent Transaction reflects a shorter duration and/or a higher Factor Rate than the then-current Agreement terms.

**4. Affirmative Reporting and Cooperation Covenant.**
4.1 Sellers and each Guarantor jointly and severally covenant and agree that they shall affirmatively monitor for, disclose, and report to Buyer each Subsequent Financing entered into by any Covered Person.
4.2 Sellers and each Guarantor shall deliver written notice to Buyer no later than one (1) week after the earlier of: (a) execution of the applicable Subsequent Financing documents or (b) funding or disbursement thereunder. Each such notice shall include, a true, correct, and complete copies of all executed documents and all information reasonably necessary for Buyer to determine whether the transaction is a Triggering Subsequent Transaction.
4.3 Sellers and each Guarantor shall, within one (1) week after Buyer's request, execute and deliver any amendment, certificate, ACH form or other document reasonably requested by Buyer to evidence, confirm, or implement any automatic adjustment under this Addendum.
4.4 Sellers and each Guarantor shall cause each Covered Person under such party's direct or indirect ownership or control to comply with this Section 4.

**5. Events of Default.**
5.1 The Events of Default section of the Agreement is hereby amended to include each of the following as an additional Event of Default under the Agreement (each of the below, an "**Addendum Default**"):
(a) the failure of any Seller or any Guarantor to give timely written notice of any Subsequent Financing as required by Section 4 of this Addendum, or to timely execute or deliver any document or instrument reasonably requested by Buyer to evidence or implement an automatic adjustment under this Addendum;
(b) any concealment, omission, misrepresentation, misleading statement, or inaccurate certification by any Seller or any Guarantor concerning any Covered Person, any Subsequent Financing, or any term thereof;
(c) any attempt by any Seller, any Guarantor, or any Covered Person acting at their direction to block, revoke, interfere with, or prevent Buyer's implementation of any revised recurring debit or remittance amount authorized by this Addendum;
(d) any third-party action or claim brought against Buyer, specifically stemming from or relating to Buyer's receipt of the weekly payment amounts from Seller under the Agreement and this Addendum; and
(e) the failure by Sellers to timely make the weekly payments required by the Agreement and this Addendum.
5.2 Each Addendum Default described in this Section 5 shall be deemed an affirmative covenant default and shall occur automatically upon the applicable failure, without further notice or cure period, except to the extent a notice period is mandatorily required by non-waivable law or to the extent a cure period is specified hereunder.

**6. Remedies Upon Default.**
6.1 For the avoidance of doubt, it is specifically agreed that only upon occurrence of an **Addendum Default** shall Buyer be entitled to the various rights and remedies available to it under the Agreement and Addendum.
6.2 Buyer specifically acknowledges that the maximum amount it is entitled to receive from Sellers and/or Guarantors shall be the Purchased Amount of Receipts under the Agreement, as may be modified from time to time pursuant to Section 3 of this Addendum.

**7. Acknowledgment of Price Protection; No Penalty.**
Sellers and each Guarantor acknowledge and agree that:

(a) Buyer entered into and/or continues to perform under the Agreement in reliance upon the pricing, risk allocation, and capital structure represented by Sellers and the Covered Persons;
(b) a Triggering Subsequent Transaction objectively reflects that Sellers and/or the Covered Persons have accepted capital on more expensive pricing and/or shorter duration terms than those then applicable under the Agreement, thereby changing the commercial risk and pricing assumptions on which Buyer entered into the Agreement;
(c) the automatic adjustment mechanism in this Addendum is an agreed, bargained-for, material, and commercially reasonable price-protection and risk-repricing provision, and is not a penalty, not liquidated damages, not default interest, not a late charge, and not a fee imposed as punishment for any breach;
(d) the automatic adjustment under this Addendum is triggered by the occurrence of a defined pricing event, not by a payment default; and
(e) any failure to disclose, report, verify, or cooperate with respect to a Subsequent Financing is a separate affirmative covenant breach and Event of Default.

**8. Further Assurances; Specific Performance.**
Sellers and each Guarantor shall execute and deliver such further documents, instruments, certificates, notices, and confirmations, and shall take such further actions, as Buyer may reasonably request to effectuate the intent of this Addendum. The parties acknowledge that a breach of Sections 3, 4, 5, or 7 may cause irreparable harm for which monetary damages may be inadequate, and Buyer shall be entitled to seek specific performance, injunctive relief, and other equitable remedies, in addition to any other rights or remedies available under the Agreement, at law, or in equity.

**9. New York Law; Written Modification.**
9.1 This Addendum, the Agreement as amended hereby, and any dispute arising out of or relating to this Addendum shall be governed by and construed exclusively in accordance with the laws of the State of New York, without regard to any conflicts-of-law principles that would require the application of the law of any other jurisdiction.
9.2 This Addendum constitutes a written amendment signed by the parties. Any automatic adjustment occurring after execution of this Addendum shall be effective pursuant to this Addendum itself and not by virtue of any oral modification or oral waiver.

**10. Miscellaneous.**
10.1 If any provision of this Addendum is held invalid, illegal, or unenforceable, the remaining provisions shall remain in full force and effect to the fullest extent permitted by law.
10.2 This Addendum may be executed in counterparts and by electronic signature, each of which shall be deemed an original, and all of which together shall constitute one and the same instrument.
10.3 This Addendum shall bind and inure to the benefit of the parties and their respective successors and permitted assigns.
10.4 Once Sellers timely make all payments required under the Agreement and Addendum, the Agreement and Addendum, shall terminate and any authorizations in the Agreement allowing Buyer to make ACH pulls shall have no further force and effect.
10.5 All notices under the Agreement and Addendum may be sent as follows:

If to Buyer: via email to jake@orca-funding.com or by overnight courier to Buyer at 33 E 33rd Street, Suite 1000, New York NY 10016;

If to Sellers: via email to mshabsels@gmail.com or by overnight courier to Sellers at 20A Grove Street, Hicksville, NY 11801.

**11. UCC-1 Filing.**
11.1 Notwithstanding anything in the Agreement to the contrary, absent the occurrence of an Addendum Default (defined above), Buyer shall not file a UCC-1 financing statement. Upon the occurrence of an Addendum Default, Buyer may, without notice to Sellers or Guarantors, file a UCC-1 in accordance with the Agreement, in addition to seeking whatever additional rights and remedies Buyer may have under the Agreement.

**IN WITNESS WHEREOF**, the parties have executed this Addendum as of the Effective Date written above.

DAMIS HOLDINGS LLC, PINE FOREST CAMPCO LLC, 11200 WEST FLORISSANT AVENUE REALTY LLC, & THE ENTITIES LISTED ON EXHIBIT A

By: DocuSigned by: Michael Shabsels BCBB5FD96F7645C...
Name: Michael Shabsels
Title: Manager

GUARANTOR(S):

By: DocuSigned by: Michael Shabsels BCBB5FD96F7645C...
Michael Shabsels

By: DocuSigned by: David Shabsels 69B4BC0438C5406...
David Arthur Shabsels